VOLUME:   I
PAGES:   1-99

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10493 GAO

```
*******************************
MANUEL ROSA,                   )
          Plaintiff            )
                               )
     vs.                       )
                               )
CITY OF BOSTON,                )
          Defendant            )
*******************************
```

    DEPOSITION OF MANUEL ROSA, a witness

called on behalf of the Defendant, pursuant

to the Massachusetts Rules of Civil

Procedure, before Kelly G. Patterson, a

Notary Public in and for the Commonwealth of

Massachusetts, at the City of Boston Law

Department, Room 615, City Hall, Boston,

Massachusetts, on Friday, September 23,

2005, commencing at 12:55 p.m.

Page 14

1    drive the car, and I was a passenger, and I
2    couldn't prove that I was the passenger
3    driving -- I mean, it was some girl driving,
4    so they blame it on me.
5    Q. What were they blaming on you?
6    A. It was like, my car, somebody else was
7     driving. I couldn't prove it anyway -- can
8     you repeat that question?
9         MR. KELLY: What did they charge
10     you with?
11    A. What did they charge me with? They said it
12     was a crime.
13    Q. What crime?
14    A. My car hit other cars.
15    Q. I see. So someone you know was driving the
16     car and you were in the passenger seat and
17     the car hit another car?
18    A. Right.
19    Q. Had the driver been drinking?
20    A. Yeah.
21    Q. When was that?
22    A. This was in 2000.
23    Q. What was that person's name?
24    A. That person's name -- they didn't bring it,

Page 15

1     though.
2    Q. Who was driving the car?
3    A. Her name is -- I can't recall her name right
4     now, but they didn't bring her in anyways.
5     It was Jamie Kirby.
6    Q. I'm sorry, Jamie Kirby?
7    A. Right.
8    Q. How did you know her?
9    A. She came over with a friend. She came over
10     my house with a friend.
11    Q. Had you met her before?
12    A. I had seen her, yeah, so I was taking her
13     home.
14    Q. Do you know if she was arrested or charged
15     with anything?
16    A. No, she wasn't arrested. She got out of the
17     car and said she wasn't driving, she lied.
18         MR. KELLY: The car was in your
19     name, it was your car?
20         THE WITNESS: It was my car.
21    Q. Are there any restrictions on when you can
22     drive or what you need to wear to drive
23     right now?
24    A. No.

Page 16

1    Q. Do you wear eyeglasses?
2    A. No, not prescribed.
3    Q. Do you wear some for reading or anything
4     like that?
5    A. No.
6    Q. Do you wear contact lenses?
7    A. No.
8    Q. Do you have any ongoing medical problems?
9    A. No. Just dentist.
10    Q. I'm sorry, the dentist?
11    A. The dentist.
12    Q. Do your teeth keep rotting on you?
13    A. Yeah, just dentist.
14    Q. So I understand that at some point in time
15     in the early 1990's you lost or had stolen
16     your personal identification, is that right?
17    A. That's correct.
18    Q. When did that happen?
19    A. That happened like in 1993, something like
20     that. '92 or '93.
21    Q. What exactly did you lose?
22    A. Did I loose?
23    Q. Yes.
24    A. My license. I lost my license.

Page 17

1    Q. Did you lose anything else?
2    A. No.
3         MR. KELLY: When you say your
4     license, do you mean your Massachusetts
5     driver's license, is that right?
6         THE WITNESS: Right, my
7     Massachusetts driver's license.
8         MR. KELLY: Mr. Forton asked you if
9     you lost anything else.
10         THE WITNESS: No.
11         MR. KELLY: You know what a Green
12     Card is and that sort of thing, did you lose
13     that?
14         THE WITNESS: No.
15         MR. KELLY: It was just your
16     license?
17         THE WITNESS: Yeah.
18    Q. How did you lose just your license?
19    A. I don't know. You got to the store or
20     something, you got to show your license.
21     Back then I was younger.
22    Q. What does that mean?
23    A. Like sometime when I drink a beer, I
24     probably left it somewhere.

G&M Court Reporters, Ltd.
617-338-0030

Page 18

1  Q. Your license, at that time in 1993, did you
2     keep it in your wallet usually?
3  A. Uh-huh.
4        MR. KELLY: Yes or no. She has a
5     hard time knowing what "Uh-huh" means on the
6     keyboard.
7        THE WITNESS: Okay.
8  A. Yes.
9  Q. When you lost your license, what did you do?
10 A. When I reported it, I don't know if they
11    kept the record.
12 Q. Who did you report it to?
13 A. The station on Gibson Street. That's where
14    they screwed me up, too.
15       MR. KELLY: Answer the question,
16    please, before I run out of here.
17 Q. Is Gibson Street a police station?
18 A. Gibson Street, yeah, that's a police
19    station.
20 Q. Do you know which police station that is,
21    what the unit is?
22 A. Yeah, that's regular police station. I
23    think it's 50 Gibson Street.
24 Q. Did you attempt to replace your license?

Page 19

1  A. Yeah.
2  Q. How did you do that?
3  A. I went over to the Registry, so they gave me
4     another one.
5  Q. Which Registry did you go to?
6  A. The one on -- the Green Line. I'm trying to
7     think what that station -- North Station.
8  Q. Okay. Did you have any trouble getting a
9     new license?
10 A. No, I have no trouble. They had me pay a
11    fee.
12 Q. Right. How much was that?
13 A. Back then it was like $33.
14 Q. So some years went by and eventually, I
15    understand, you were arrested, correct?
16 A. Right.
17 Q. When was the first arrest after losing your
18    identification?
19 A. It was in 1997. I think it was March 10.
20 Q. Had you ever been arrested before that?
21 A. No.
22 Q. So this was your first arrest ever?
23 A. Right, ever.
24 Q. Who arrested you?

Page 20

1  A. It was two white police officers. They came
2     to my house at 523 Geneva Ave. around two
3     o'clock.
4  Q. Do you know the officers' names?
5  A. No.
6  Q. What time two o'clock, was it two in the
7     morning or two p.m.?
8  A. Two p.m.
9  Q. What day of the week was that?
10       MR. KELLY: If you remember.
11 A. It was March 10.
12 Q. Was it on the weekend or was it during the
13    week?
14 A. It was during the week, because I remember I
15    was getting ready to go to work.
16 Q. Do you remember the officers' names?
17 A. No, I don't remember their names.
18 Q. Did they tell you why they were arresting
19    you?
20 A. Yeah, they told me. They said "You're being
21    arrested for distributing drugs around the
22    neighborhood."
23 Q. What did you say?
24 A. I said "How is that? I've never been

Page 21

1     arrested before. I don't sell drugs."
2  Q. Then what happened?
3  A. They asked me for my full name and they
4     asked me if I was born in February, and I
5     said "No, I wasn't born in February," and
6     they said "Well, it's your social security
7     and it's your full name, so we have to take
8     you to the station," and they took me to the
9     station.
10 Q. When you were arrested, were you in your
11    home?
12 A. I was in my house.
13 Q. So they took you down to the station?
14 A. Right.
15 Q. What station did you go to?
16 A. 50 Gibson Street.
17 Q. Then what happened?
18 A. Then he asked me what's your father's name,
19    what's your mother's name, where do you
20    live, and then they asked me for my name and
21    everything about me, my identification, and
22    then I was looking at the computer when he
23    was typing on the computer and I saw when he
24    took the guy that committed the crime out of

6 (Pages 18 to 21)

Page 22

1   the computer and he put me in. He said "We
2   got him now. Book him," and I said "Why did
3   you do that when we haven't gone to court
4   yet," and he said "Book him."
5   Q. Who was that?
6   A. It was a black police officer.
7   Q. Do you know that person's name?
8   A. No, I don't know his name.
9   Q. Now, explain to me exactly what you saw.
10   Where were you in the station?
11   A. I was where they take the photos.
12   Q. Who took your photo?
13   A. It was a black police officer.
14   Q. So he took your photo and then where did you
15   go physically in the station after that?
16   A. They locked me up.
17   Q. So they locked you up and then how did you
18   see the officer do anything with your
19   photograph?
20   A. Because where he was at, the computer was
21   like twisted a little, so I could -- I was
22   looking. It was a possibility because the
23   computer is twisted.
24   Q. How much of the screen could you see?

Page 23

1   A. It was pretty much. It was a glass screen.
2   Q. How big was the screen?
3   A. It was like half of this table.
4       MR. KELLY: This is the computer
5   screen we're talking about.
6   Q. I'm talking about the computer screen.
7   A. About that big.
8   Q. So how big would you estimate in inches?
9   A. I'm not too good in figuring out the inches.
10   Q. How about in centimeters?
11   A. Like that kind of computer.
12   Q. So now where was this officer when he
13   supposedly did this?
14   A. He was behind where they usually -- when
15   they bring in somebody is arrested, anybody,
16   that's where he was at, his normal every day
17   chair to identify people. You know what I'm
18   saying?
19       MR. KELLY: You know what a booking
20   desk is? Did it look like that? Is that
21   where he asked you the questions, he was
22   behind the desk asking you the questions?
23       THE WITNESS: Let me see. You know
24   where they arrest people and they bring

Page 24

1   them, every people that they arrest, that's
2   where they bring them.
3   Q. That's fine.
4   A. So he was behind.
5   Q. So he's behind the desk and you're in front
6   of the desk, right?
7   A. Right.
8   Q. So --
9   A. In front of the camera.
10   Q. Is he the officer that took your photo?
11   A. The black police officer.
12   Q. He took your photograph?
13   A. Right.
14   Q. Did it show up on the computer somehow?
15   A. I couldn't see -- I could see him writing
16   and then I could see the computer very
17   clearly, and I saw when he took me out of
18   the computer, very clearly.
19       MR. KELLY: You say he took you out
20   of the computer --
21       MR. FORTON: Mr. Kelly. Mr. Kelly.
22   I'm just going to ask that you ask your
23   questions at the end of the deposition. I
24   think I've given you a lot of leeway to this

Page 25

1   point.
2       MR. KELLY: I appreciate that. I
3   just don't think he's hearing you right.
4       MR. FORTON: Well, you can ask
5   whatever you want at the end of the
6   deposition. I'm not trying to pull any fast
7   ones.
8       MR. KELLY: All right.
9   Q. I'm trying to understand the physical space
10   between you and this black officer?
11   A. Okay.
12   Q. So he's behind the desk and you're in front
13   of the desk?
14   A. As far as me and you, that's how far.
15   Q. So would you say we're about five or six
16   feet away from each other?
17   A. I would say five or six feet.
18   Q. Now, you just told me that there's glass
19   between the officer and you?
20   A. Right.
21   Q. But somehow you saw around the glass to the
22   computer screen which was facing the black
23   police officer?
24   A. Right. Exactly.

7 (Pages 22 to 25)

Page 26

1  Q. Were you fingerprinted at that time?
2  A. Uh-huh, I was fingerprinted at that time.
3  Q. So would you -- did you consider yourself
4     booked at that moment?
5  A. I mean, I heard that word on T.V., when I
6     used to watch Barretto, you know what I'm
7     saying, but when he said "Book him", all I
8     know is he said "We got him now, book him,"
9     and I'm like "What?"
10 Q. Did you have a good understanding of what
11    was going on while you were in the police
12    station at the time?
13 A. The only thing I understood what he said was
14    I was being arrested for distributing drugs
15    around the neighborhood, and I was like "My
16    goodness, how is that possible. I never did
17    that."
18 Q. Now, you've alleged that you saw your photo
19    being replaced on the computer screen?
20 A. Uh-huh.
21 Q. Was there any photo there before your photo
22    was placed there?
23 A. There was somebody's photo. I couldn't
24    figure out who it was.

Page 27

1  Q. You don't know who it was?
2  A. I couldn't see who was in the computer, but
3     the only thing I saw was when he replaced my
4     photo with the other guy. I saw that very
5     clearly, because I even told him, "Why you
6     take that person out of the computer and put
7     me in when I haven't even gone to court
8     yet."
9  Q. So then what happened, you spent the night
10    in lock up?
11 A. Right. I spent the night.
12 Q. Were you eventually brought before the
13    court?
14 A. Right. They brought me to the Superior
15    Court.
16 Q. Was that the Suffolk Superior Court, do you
17    know?
18 A. It was the one right there in that plaza
19    right there.
20 Q. Okay. Did you have a lawyer at that time?
21 A. Yes, I had a lawyer at that time.
22 Q. Who was that?
23 A. His name is -- I can't recall. I don't want
24    to say. I'm not sure about his name.

Page 28

1     Pakowski, something like that.
2  Q. That's fine.
3     MR. KELLY: Do you want me to give
4     you the name?
5     MR. FORTON: We can get it later.
6  Q. What happened in court?
7  A. What happened in court? The judge asked me
8     what's your name, dah, dah, dah, what year,
9     what month I was born. He asked "Was you
10    born in February?". I said "No, I wasn't
11    born in February, I was born in November,"
12    and I said "Judge, I've never been arrested
13    before." So he said "You've never been
14    arrested before?" So they went and checked
15    the federal records. So then we -- they
16    brought me back to the cell and then later
17    they brought me back and my lawyer, he
18    showed me the picture of the guy that did
19    the crime, and he said "This guy don't even
20    look like you," and he told me to fight the
21    case. So then after that, years went by and
22    they kept me in the computer.
23 Q. So, I'm sorry, he told you to fight the
24    case?

Page 29

1  A. Uh-huh.
2  Q. What case was that?
3  A. Because he was saying that I'm innocent.
4  Q. What did the court do?
5  A. The court, they gave me a letter -- they
6     sent one of the people that work with them
7     and they brought me to the records room to
8     make sure that I got a letter.
9  Q. So were you set free at that time?
10 A. Right. I was set free.
11 Q. You went and you got a letter?
12 A. Right.
13 Q. Where did you go to get that letter?
14 A. It was in -- I think it was the records
15    room. It was in the plaza right there.
16 Q. Did someone eventually write a letter of
17    some sort?
18 A. In the records room. It's the only letter
19    that they can give you. I went back and
20    they gave me a better letter.
21 Q. So I have in front of me a couple of
22    different letters. I have one that's dated
23    March 19, 1997, and I have, I think, two
24    copies of the same letter from 1998.

8 (Pages 26 to 29)

Page 30

1    MR. FORTON: Can we mark this as
2  Exhibit No. 1, please.
3      (Letter dated 3/19/97 marked
4  Exhibit No. 1 for Identification.)
5  Q. I'm going to show you a document I just
6    marked as Exhibit No. 1. Is this a copy of
7    the letter you received then?
8  A. Yes, that was the first one.
9  Q. When did you receive this letter?
10  A. I received it on the next day from being
11    arrested.
12  Q. Could I see the letter, please?
13      MR. KELLY: If I can just make a
14  clarification. As you can see at the bottom
15  of Exhibit No. 1, it appears to be a copy of
16  his license on there, that is something that
17  came later. I'm not sure why, but the
18  original letter, I provided to you earlier,
19  and that's a copy of the original you have
20  in your left hand, so why that is on there,
21  I don't know. I think that was done later
22  to further verify who that was.
23      MR. FORTON: Why don't I, for the
24  record, mark this second letter here Exhibit

Page 31

1  No. 2 so we can clarify.
2      (Letter marked Exhibit No. 2 for
3  Identification.)
4      MR. FORTON: So Exhibit No. 2, just
5  for the record here, is a letter written by
6  Sandy Stillwell. This looks like it was
7  actually written in 1998, so I don't think I
8  have the original 1997 letter.
9      MR. KELLY: I thought you said they
10  were both the same.
11      MR. FORTON: No. I have two -- why
12  don't we mark this third letter Exhibit
13  No. 3 so that we can discuss that, as well.
14      (Letter marked Exhibit No. 3 for
15  Identification.)
16  Q. So Exhibit No. 2 is a copy of an original
17    that you've given me, and Exhibit No. 3 that
18    we've just marked looks like a better copy
19    of No. 2?
20      MR. KELLY: Correct. Just off the
21  record for a second.
22      (Discussion off the record.)
23  Q. Let me show you again, Mr. Rosa the first
24    letter we were discussing, Exhibit No. 1.

Page 32

1    Is that a copy of the letter that you
2    received after that first arrest?
3  A. Yes.
4  Q. What did that letter say, to your
5    understanding?
6  A. That letter says -- "To whom it may concern,
7    This is not the person you are looking --
8    subject to the matter" -- whatever --
9    "determined" --
10  Q. You don't have to read the letter, that's
11    fine, but what was your understanding when
12    you left with that letter from the court?
13    What did you understand it to say?
14  A. I was to carry it on person at all times,
15    that's what I understood.
16  Q. Then you were just set free after that,
17    right?
18  A. Uh-huh.
19  Q. Who was your employer --
20  A. Yes.
21  Q. -- at the time that you were arrested?
22  A. Who was my employer?
23  Q. Yes.
24  A. It was a person named Patty. I was working

Page 33

1    at the Mass. College of Arts.
2  Q. What did you do at the Mass. College of Art?
3  A. I was dish washing, and then I was to serve
4    the college students, serving the food when
5    they come for lunch.
6  Q. Okay. Did they find out that you were
7    arrested?
8  A. Yeah, they was asking me why didn't you
9    come, dah, dah, dah, what happened, dah,
10    dah, dah.
11  Q. Who was it who asked you that?
12  A. The students.
13  Q. The students?
14  A. Uh-huh.
15  Q. Did anybody that you worked for ever ask
16    you?
17  A. Yeah, my boss.
18  Q. What did you say?
19  A. I told him that I got arrested and then
20    sometimes I spoke to him about it and he
21    said "I think you're traumatized. If you
22    need help, let me know. I think you're
23    traumatized," that's what he said.
24  Q. Did you continue to work there?

9  (Pages 30 to 33)

Page 34

1  A. Yeah, I continued to work there for awhile.
2  Q. How long did you keep working there?
3  A. Like almost a year, something like that.
4  Q. So you continued to work at Mass. College of
5     Art, and were you arrested again?
6  A. Yes.
7  Q. When did that happen?
8  A. That happened like maybe a year later,
9     something like that.
10 Q. I understand that at some point recently
11    after that first arrest you were arrested
12    again, is that right?
13 A. That's correct.
14 Q. So was it like a couple of weeks after or a
15    year after or?
16 A. It was something like a year after, over the
17    same thing.
18 Q. Do you recall being pulled over by a police
19    officer after making an illegal u-turn?
20 A. Yes, I recall that.
21 Q. Was anybody in the car with you?
22 A. Yeah, there was somebody in the car with me.
23    There was a girl that she was working where
24    I was working.

Page 35

1  Q. What was her name?
2  A. Her name was Suzanne Ruggiero.
3  Q. Ruggiero?
4  A. Uh-huh, with a double G.
5  Q. Where were you when you were pulled over?
6  A. I was at the light, and then I crossed over
7     the light, and then Suzanne Ruggiero wanted
8     to talk to somebody, so I made a u-turn at
9     the lights, and the police officer saw me do
10    the u-turn.
11 Q. What intersection was that?
12 A. It was Geneva and Bowdoin Street.
13 Q. What time of day was it?
14 A. It was like 11:30, something like that.
15 Q. 11:30 in the morning or the evening?
16 A. In the evening, because I was giving her a
17    ride to her house from work.
18 Q. So did the police officer pull you over?
19 A. Yeah.
20 Q. Was there more than one officer or just one?
21 A. Later other police officers came over.
22 Q. At first when you were pulled over, was it
23    just one officer who pulled you over?
24 A. Yeah, it was just one officer.

Page 36

1  Q. Do you know who the officer was?
2  A. It was a white police officer, that's all I
3     know. Kind of an old man.
4  Q. So what did he say to you?
5  A. He asked me for my registration and then
6     another police officer came by and he told
7     the girl I was driving "What are you doing
8     with a guy like that?"
9  Q. So what happened after you were pulled over?
10 A. After I was pulled over, they towed my car
11    and they brought me to jail.
12 Q. Why did they do that?
13 A. Because of the warrant.
14 Q. At that time, did you have the letter in
15    your possession?
16 A. Yeah, I had the letter in my possession.
17 Q. Is that the letter, Exhibit No. 1, right
18    there?
19 A. Yeah.
20 Q. Did you show the letter to the police
21    officers?
22 A. Yes, I did.
23 Q. What did the police officers do after they
24    saw the letter?

Page 37

1  A. They looked at the computer and they said
2     "You're wanted for a warrant."
3  Q. When you say they looked at the computer,
4     what did you actually see them do?
5  A. I didn't see, I heard.
6  Q. So did they tell you that they checked the
7     computer and there was a warrant for your
8     arrest?
9  A. They didn't tell me they checked the
10    computer, they just tell me he has a
11    warrant.
12 Q. So someone said there's a warrant for your
13    arrest, right?
14 A. Right.
15 Q. And they said "We're going to have to take
16    you down to the station," right?
17 A. Right.
18 Q. So did you get into the police car with
19    them?
20 A. Right.
21 Q. Where did Suzanne Ruggiero go?
22 A. She went to her man's house.
23 Q. So she left the scene there?
24 A. Right.

10 (Pages 34 to 37)

Page 38

1   Q. So you were taken downtown -- I'm sorry, to
2      the station?
3   A. They did sometimes, too.
4   Q. I'm sorry?
5   A. Other times they brought me to downtown.
6   Q. Okay. Where did you go on this arrest?
7   A. That one, I went to 50 Gibson Street.
8   Q. What happened at the station when you got
9      there?
10  A. Not much at that one. They just locked me
11     up.
12  Q. Did they book you, did they fingerprint you?
13  A. Yeah, they fingerprint me.
14  Q. Did they take any photos of you?
15  A. Yeah.
16  Q. So you were locked up again?
17  A. Right.
18  Q. Then the next day, did you go to --
19  A. I went before the same judge.
20  Q. Who was that, by the way?
21  A. I don't know if his name is Sandy or
22     something.
23       MR. KELLY: If you know.
24  A. I'm not too sure. I remember him, but if

Page 39

1      he's the one who signed the letter, the name
2      right here.
3   Q. Did you have a lawyer after this arrest?
4   A. After this arrest, I had the same lawyer,
5      but I didn't see him.
6   Q. So, I'm sorry, so you had the same lawyer as
7      the first arrest?
8   A. Right.
9   Q. But you said you didn't see him?
10  A. No, I didn't see him. I showed him the
11     letter, I still had this letter, and I told
12     the judge, "Judge, I remember this is the
13     same case," and he shook his head. That was
14     like the second time I went before him. I
15     went three times before him.
16  Q. So what did the Court do after you showed
17     him the letter?
18  A. The Court, they just let me go.
19  Q. Do you remember the Court saying anything to
20     the prosecutor?
21  A. The Court?
22  Q. I'm sorry, when I say "the Court", I mean
23     the judge or whoever was on the bench at the
24     time.

Page 40

1   A. He was talking to me.
2   Q. He didn't say anything to anybody else?
3   A. No. Not that I know of.
4   Q. So you were set free after this arrest?
5   A. Right.
6   Q. If I said that you were arrested on the 23rd
7      of March, 1997, would that refresh your
8      recollection, that was about two weeks after
9      the first arrest?
10  A. Well, on the first arrest, he told me that I
11     had to come back, so I was told that I had
12     to come back, "If you don't come back,
13     that's going to look like you did it," so I
14     made sure I came back.
15  Q. When did you go back?
16  A. It was about two weeks later.
17  Q. So after these two arrests, were you
18     arrested again?
19  A. Yes.
20  Q. When did that happen?
21  A. That happened about a year later. They
22     arrested me seven times, only three times
23     they let me go the same night, that's what
24     happened.

Page 41

1       MR. FORTON: Let me just have a
2   minute here.
3       (Discussion off the record.)
4       (Recess.)
5   Q. So the records I had, I think we might be
6      able to straighten this out, I had thought
7      earlier that when you were pulled over at
8      Geneva and Bowdoin that was March 23 of
9      1997, but I think it was in 1998, about a
10     year or so after you were first arrested?
11     (Witness nods.)
12  Q. Okay. So on the 23rd of March, you hadn't
13     been arrested again, you just went back to
14     court as you were ordered to do after you
15     were first arrested, right?
16  A. Correct.
17  Q. So you went back on the 23rd in order to
18     clear your name, right?
19  A. Exactly.
20  Q. Now, you mention that when you were pulled
21     over after the u-turn, right before the
22     second arrest, that your car was taken away.
23     Do you know where it was taken?
24  A. It was taken, I think that's 1320 Dorchester

11 (Pages 38 to 41)

Page 42

```
1      Ave.
2   Q. Is that a tow lot of some kind?
3   A. Right, it's a tow lot.
4   Q. So when you were released by the Court, did
5      you go pick your car up?
6   A. Yes, I did.
7   Q. Did it cost you anything to go pick up the
8      car?
9   A. Yeah, they charged me like $95 per day, but
10     I went in the next day.
11  Q. Do you have any receipt for the money that
12     you paid?
13  A. No.
14  Q. What was the license plate of the car that
15     you were driving?
16  A. I don't remember the license plate.
17  Q. What kind of car was it?
18  A. It was an Oldsmobile.
19  Q. What year was it?
20  A. I think it was '89.
21  Q. What color was it?
22  A. It was red.
23  Q. Do you know the model?
24  A. Oldsmobile.
```

Page 43

```
1   Q. Oldsmobile is the maker, do you know the
2      kind of Oldsmobile?
3   A. I don't know. It was an electric car.
4   Q. Did you own this car?
5   A. Yeah, it was mine.
6   Q. How long had you owned it?
7   A. I owned it for like a year, something like
8      that.
9   Q. It was registered with the Commonwealth?
10  A. Right here in North Station.
11  Q. So you did register the car?
12  A. Right.
13  Q. So I have in your records, at some point you
14     were brought before the Dorchester District
15     Court, is that right?
16  A. One time, right.
17  Q. Was that after you were picked up after the
18     u-turn?
19  A. No, that was something different.
20  Q. So when was it that you were before the
21     Dorchester District Court?
22  A. That was in the year 2000. That time. It's
23     in Spanish, but I don't know if you can tell
24     the year. (Indicating.)
```

Page 44

```
1   Q. So this that you just showed me is some sort
2      of a certificate of completion from Boston
3      ASAP?
4   A. Right, because they charged me for drinking.
5   Q. I see.
6   A. For drinking and driving.
7   Q. We'll get to that later. Let me quickly
8      make a copy of this.
9         (Recess.)
10        (Certificate of Completion marked
11     Exhibit No. 4 for Identification.)
12  Q. So Exhibit 4, which you just handed me, this
13     is a copy of what you handed me. It's a
14     Certificate of Completion of some kind of
15     counselling in Spanish?
16  A. Right.
17  Q. Great. So it was in -- so you went to
18     Dorchester District Court after you were
19     charged with operating under the influence
20     of alcohol, right?
21  A. Right.
22  Q. We'll talk about that later. So in 1998
23     when you were before the Suffolk Superior
24     Court after the arrest where you were picked
```

Page 45

```
1      up after you made the illegal u-turn, did
2      you receive another letter of any kind from
3      the Court or anybody?
4   A. Not at that time.
5   Q. Because I have these two documents here,
6      Exhibits 2 and 3 right here. Exhibit 2 is a
7      copy of an original of a letter that it
8      looks like you carried around for a long
9      time in your wallet, is that right?
10  A. Right. This is that one that I was
11     carrying.
12  Q. Your attorney clarified for me that Exhibit
13     No. 3 is a copy of the same letter that he
14     got from the probation officer who wrote the
15     letter, is that right?
16  A. Yeah, that's correct.
17  Q. So now, when did you receive these -- well,
18     I'll call it "this" letter, because it's
19     essentially the same letter?
20  A. When did I receive this letter?
21  Q. Yes.
22  A. This letter, I received it in 2001.
23  Q. Why don't we take a look at the exhibit.
24        MR. KELLY: Let's take a look at
```

12  (Pages 42 to 45)

Page 46

1    the date.
2    Q. The date of the letter is 12 March 1998.
3    A. That's what it says.
4    Q. Yes. So if you received this on 12 March
5        1998, you probably did receive a letter of
6        some kind after arrest No. 2 in 1998?
7    A. Right, because they gave me from this one to
8        this one.
9    Q. Hold on. You just pointed to Exhibits 2 and
10       3. Exhibits 2 and 3 are the same letter.
11       Exhibit 1 is the first letter and Exhibits 2
12       and 3 are the second letter, right?
13   A. Right.
14   Q. So you're saying in 1998 someone at the
15       probation office wrote another letter for
16       you, right?
17   A. Uh-huh.
18        MR. KELLY: Do you see the date of
19   this letter?
20        THE WITNESS: Yeah, March 19.
21        MR. KELLY: You see the date of
22   this letter?
23        MR. KELLY: Yeah.
24        MR. KELLY: He's asking which one

Page 47

1    do you remember getting first?
2    A. This one was not first.
3    Q. So you received Exhibit 1 first, right?
4    A. Right.
5    Q. Then after your second arrest, you received
6        Exhibit 3?
7    A. Right.
8    Q. So now, eventually, you were arrested again
9        in connection with this same warrant, right?
10   A. Right.
11   Q. Do you remember when that was?
12   A. I don't remember the year. It was when I
13       was working for doing food delivery. I was
14       on Melville Street trying to take a left,
15       and it was dark over there, there was no
16       lights, and then there was a car coming, and
17       then I went before him, even though I saw
18       him, I just tried to go before him, and the
19       police officer put the light on, he felt
20       like I cut him off, so then he said "You got
21       a warrant." I had another car at that time.
22       I don't remember the name of the car.
23   Q. When you were pulled over then, did you
24       spend the night in jail again?

Page 48

1    A. That time, I don't think I spent the night,
2        they let me go.
3    Q. I'm trying to focus on the times where you
4        had to go to court afterwards, and so far I
5        have that down to three arrests. This third
6        arrest I'm asking you about happened in
7        January of 2001, do you recall that?
8    A. 2001, yeah.
9    Q. So in January of 2001, you were arrested
10       again?
11   A. Right.
12   Q. Do you remember what time of day that was?
13   A. I can't remember the time of day. All I
14       know is I remember being before the judge.
15   Q. Well, let's wait to talk about the judge.
16       I'll definitely get to that. I'll guaranty
17       you. Do you remember, was it in the
18       daytime, was it in the nighttime?
19   A. It was in the nighttime.
20   Q. Where were you when you were arrested?
21   A. I was working for East Coast Restaurant.
22   Q. Where were you exactly when you were
23       arrested?
24   A. I was on Alston Street in Dorchester.

Page 49

1    Q. Is that near your home?
2    A. Pretty much, yeah.
3    Q. Was anybody with you at that time?
4    A. No.
5    Q. When you were arrested, was anybody around?
6    A. No.
7    Q. What did the police officer say to you?
8    A. He said that I cut him off and I got a
9        warrant.
10   Q. So did he know right away that there was a
11       warrant for your arrest?
12   A. He took my registration and my license.
13   Q. He went back to his car?
14   A. He went back to his car.
15   Q. Then he came back to your car and said
16       there's a warrant out for your arrest?
17   A. Right.
18   Q. What did you do?
19   A. I said "But I have a letter right here."
20   Q. Did you show him the letter?
21   A. Yeah.
22   Q. What did he say?
23   A. He said that letter, he could write that
24       letter at home.

13  (Pages 46 to 49)

Page 50

1  Q. Did he say he didn't want to take any
2     chances?
3  A. That was another time.
4  Q. When was it that a police officer said that?
5  A. That was -- this was in the daytime, they
6     brought me to another station.
7  Q. So let's go back to the January 17 arrest.
8     So were you taken down to the station again?
9  A. Right.
10 Q. Were you booked again?
11 A. No. The only time they used the word booked
12    and we got him now was the first time I was
13    arrested.
14 Q. So you were taken down to the station this
15    third time and what happened at the station?
16 A. They locked me up.
17 Q. Did they acknowledge that you were there at
18    all, did they take your photo, did they do
19    anything?
20 A. They took my photo. They had me take my
21    pants down and show them my booty, and that
22    was so embarrassing, but anyway.
23 Q. So you were locked up again?
24 A. Uh-huh.

Page 51

1  Q. Do you remember the officer's name, the one
2     who arrested you?
3  A. No. I only remember the first ones face,
4     the first time ever. I don't remember his
5     name.
6  Q. Were you brought before the Court the next
7     day?
8  A. Uh-huh.
9        MR. KELLY: Yes.
10 A. Yes.
11 Q. What happened when you were there?
12 A. Nothing. I just spent the night in jail.
13 Q. But when you went to court, what happened
14    when you went to court in 2001?
15 A. The one in 2001, that happened at another
16    street. I was brought to Roxbury.
17 Q. Let's -- I think you may be a little
18    confused here. Hold on. Let me clarify
19    this. In January 17 of 2001?
20 A. Right.
21 Q. You were arrested?
22 A. Right. That was the last time.
23 Q. So this is 2001, this is the one we're
24    talking about, that was the last time you

Page 52

1     spent the night in the lock up and then you
2     were taken to court the next day?
3  A. Right.
4        MR. FORTON: Let's go off the
5     record.
6        (Discussion off the record.)
7  Q. Your lawyer just clarified for me that you
8     were taken to Roxbury District Court first
9     on that day afterward?
10 A. Right, they brought me to the station at
11    Roxbury. They -- I went in to the store. I
12    bought a soda. He pulled out of nowhere,
13    this was in the daytime, and he pulled over
14    and he said "What are you doing right
15    there," and I had my car right there because
16    I was working at East Coast at that time, I
17    had my car pulled over, and I went into the
18    store to buy something and I went around the
19    corner, and then I guess that's a hot street
20    or something, but there's a corner store
21    over there to buy a soda, and then I -- he
22    just pulled over out of nowhere "What are
23    you doing over there?" He told me "Have you
24    been arrested before, because you're already

Page 53

1     going to jail anyway, because I got you
2     right here," so I said "Yeah, I've been
3     arrested before over a warrant over the same
4     station," so when he brought me to the
5     station, he said "I got to take you. It's
6     you in the computer. I can't take no
7     chances."
8  Q. Why did he arrest you?
9  A. Because of the warrant.
10 Q. So let me try to clarify. We were just
11    talking as though the January 17, 2001
12    arrest was for cutting off a police officer
13    in your car?
14 A. Right, that was at nighttime.
15 Q. So that's a different time, right?
16 A. Right.
17 Q. So let's talk about the January 17, 2001
18    arrest. Okay? So the January 17, 2001
19    arrest happened after you bought a soda at
20    the corner store, right?
21 A. Right.
22 Q. Where you when you were arrested, in
23    front of the store?
24 A. On the side of the store.

14  (Pages 50 to 53)

Page 54

1   Q. So you were on the side of the store?
2   A. Right.
3   Q. What's the address of the store?
4   A. That's on the corner of Bernard Street and
5      Hover Street.
6   Q. So you were brought to the court the next
7      day, right, after you were arrested?
8   A. Correct.
9   Q. What court was that?
10  A. That was the Superior Court.
11  Q. Okay. Well, your attorney told me that
12     first you were taken to the Roxbury District
13     Court and then you were transferred over to
14     the Superior Court. Does that make sense?
15  A. I don't remember. I spent the night in jail
16     in Roxbury.
17  Q. That's fine. At some point, you did end up
18     in Superior Court, right?
19  A. Right.
20  Q. Did you have a lawyer when you got there?
21  A. Yeah, I had a different lawyer.
22  Q. Who was that lawyer?
23  A. I don't know his name.
24  Q. If I told you that that lawyer is sitting

Page 55

1      right next to you right now, would that
2      refresh your recollection?
3   A. He was my lawyer in 2001.
4   Q. Right, that's what we're talking about right
5      now.
6          MR. KELLY: That's what we're
7      talking about. January 18 in Superior
8      Court, he's asking you do you remember what
9      lawyer the court appointed to you.
10         THE WITNESS: Okay.
11         MR. KELLY: Do you remember who
12     that person is?
13         THE WITNESS: Arthur Kelly.
14  Q. He's your attorney now in this case?
15  A. Right.
16  Q. Mr. Kelly was in court at the time, is that
17     right?
18  A. Right.
19  Q. Did the court appoint him to represent you?
20  A. Right.
21  Q. Had you ever met Mr. Kelly before in your
22     lifetime?
23  A. No, that was the first time ever.
24  Q. Okay. Good. So tell me what happened in

Page 56

1      court after Mr. Kelly was appointed to
2      represent you?
3   A. What happened in court, it was Channel 7 was
4      over there and --
5   Q. Hold on, let's just talk about what happened
6      in court.
7   A. I know, that's what I'm saying.
8   Q. Channel 7 was in court?
9   A. Right.
10  Q. Why were they in court?
11  A. It was different totally -- a different
12     case.
13  Q. Okay.
14  A. So I told the judge this is the same case,
15     and they took me for "book him" and the
16     judge said "I can't believe they took you."
17  Q. I'm sorry, they took you for what?
18  A. For book him. I said the police officer,
19     the first time, that they brought me to the
20     station, so I told him -- I told the judge,
21     I said "We got him now. We took him for
22     book him."
23  Q. I'm sorry?
24         MR. KELLY: Pronounce that word a

Page 57

1      little better.
2   A. Book him.
3   Q. Booking?
4   A. Booking.
5   Q. Booking with an I-n-g?
6   A. Yeah, I always say "book him".
7   Q. So the judge in Superior Court in 2001, what
8      did he say to you?
9   A. He asked me did I have the letter with me,
10     and I said yes, I did, I had the letter with
11     me.
12  Q. And what did you do?
13  A. I showed him the letter.
14  Q. Which letter did you show him?
15  A. I don't remember.
16  Q. If I show you Exhibit No. 1 and Exhibit
17     No. 3, do you remember was it either of
18     these letters?
19  A. It was either one, yeah.
20  Q. It was one of these two, though?
21  A. Right. Because I think in 2001 he gave me,
22     the judge gave me another letter, but I
23     can't recall where I put it, but I know that
24     they gave me those definitely, because other

15 (Pages 54 to 57)

Page 58

1    times I went to the records room.
2    Q. So at some point, did the Court determine
3       that you were not the person in the
4       indictment?
5    A. Right.
6    Q. So the warrant didn't apply to you?
7    A. Exactly.
8    Q. What happened after the Court made that
9       determination?
10   A. In 2001?
11   Q. Yes.
12   A. What happened was that he said, the judge
13      said he's going to make sure that this
14      doesn't happen again, and he was talking
15      about compensation. He said what am I going
16      to do with that, because I told him, first
17      I'm going to help myself before I help
18      others, and I don't know what to say, that's
19      what I told him. And he said "Okay, I'm
20      going to give him a good lawyer. I'm going
21      to make sure that this doesn't happen
22      again."
23          MR. KELLY: Off the record. I'm
24      going to strike that last remark but.

Page 59

1           (Discussion off the record.)
2           MR. FORTON: Back on.
3    Q. So your attorney just cleared up for me that
4       you were never before a judge in the
5       Superior Court until after this third
6       arrest? You were always before clerk
7       magistrate Gary Wilson?
8    A. Right.
9    Q. That person was always wearing a suit,
10      right, and not a black robe?
11   A. The judge, right?
12   Q. Yeah, the person on the bench.
13   A. Yeah.
14   Q. So it's not too important, but just to
15      clarify. So after that hearing, did you go
16      free?
17   A. Yeah.
18   Q. So you were free?
19   A. Right.
20   Q. And then did your lawyer do anything for you
21      after that?
22   A. He brought me to his office, Arthur Kelly.
23   Q. But later on, there was another hearing,
24      right, with a judge in a black robe?

Page 60

1    A. Yeah, there was another one.
2    Q. So a couple of weeks later, right?
3    A. Something like that.
4    Q. You went there and what did your lawyer ask
5       the Court to do?
6    A. Ask him to -- she asked him to --
7    Q. No, no. What did your lawyer ask the judge
8       to do?
9    A. My lawyer told them that I was told before
10      they're going to take him out of the
11      computer and they never did, and the judge
12      said "No, this time we're going to do it."
13   Q. So after that hearing in February of 2001,
14      were you ever arrested again in connection
15      with this warrant?
16   A. No.
17   Q. So as far as you know, everything is cleared
18      up?
19   A. Right.
20   Q. Now, so far we've discussed three different
21      arrests where you spent the evening in the
22      lock up?
23   A. Right.
24   Q. That was the March 10, 1997 arrest and the

Page 61

1    March 11, 1998 arrest and then the
2    January 17, 2001 arrest, correct?
3    A. Correct.
4    Q. You mentioned in your Answers to
5       Interrogatories that your lawyer sent to me
6       that you were arrested seven different times
7       in connection with this warrant?
8    A. Correct.
9    Q. So tell me when the other four times were.
10   A. One time I was smoking a cigarette in the
11      station.
12   Q. What station is that?
13   A. Outside Downtown Crossing.
14   Q. When did this happen?
15   A. That happened -- it happened before 2001.
16   Q. Did it happen after 1998?
17   A. I don't know if it was in 1998, but it was
18      like before 2001, so the warrant appeared
19      again. He was going to just give me a
20      citation.
21   Q. Hold on. So you're smoking in front of
22      Downtown Crossing?
23   A. Right.
24   Q. And tell me what happened.

16 (Pages 58 to 61)

Page 62

1  A. There was two police officers over there.
2  Q. Uh-huh.
3  A. That was in 2000, because I was coming from
4     school, that school, the letter I just gave
5     you.
6  Q. Yes, you were coming from your alcohol
7     counselling?
8  A. Right, I was coming from over there.
9  Q. You were smoking a cigarette in front of the
10    Downtown Crossing Station?
11 A. Right, like downstairs.
12 Q. Tell me what happened next.
13 A. There was two police officers, and he was
14    going to charge me for citation.
15 Q. What was he going to cite you for?
16 A. What was he going to what?
17 Q. He was going to give you a citation. Why
18    was he going to give you a citation?
19 A. For smoking a cigarette.
20 Q. Inside the station?
21 A. Right, even though I wasn't inside, but I
22    was near, so then my warrant came up, and he
23    had no choice but to bring me somewhere in
24    downtown, and then I had to wait -- I was

Page 63

1     getting ready to go to work, I was rushing
2     to go to work, working at East Coast
3     Restaurant, which that's at 1456 Dorchester
4     Ave., and the employer's name is Hung Chu
5     Chan, and the manager is Dwight Brown. He
6     speaks better English because Hung Chu Chan
7     is Chinese. So anyway, they brought me to
8     the station, so I lost my day of work, and
9     then I had to wait for somebody to figure
10    out the document and then they let me go.
11 Q. Okay. So you showed them one of the
12    documents, either Exhibit 1 or 2 or 3?
13 A. One of them.
14 Q. Eventually, they just let you go, right?
15 A. Right.
16 Q. So you didn't spend the night in jail or
17    anything?
18 A. No.
19 Q. You didn't have to go to court or anything?
20 A. Not that time.
21 Q. So you were gone -- what time in the morning
22    were you arrested?
23 A. It was about five o'clock, something like
24    that. Five o'clock in the afternoon.

Page 64

1  Q. What time were you set free?
2  A. I was set free around like nine, 9:30.
3  Q. Were you working in the evening at that
4     time?
5  A. Right, exactly.
6  Q. So let's talk about one of the other times
7     that you were picked up but didn't have to
8     go to court. So one time was this smoking
9     in front of Downtown Crossing. What was
10    another time?
11 A. I'm trying to recall.
12 Q. I can give you as much time as you need.
13 A. There was another time I was driving, I was
14    doing food delivery, and the police officer
15    felt like I didn't stop correctly on the
16    stop sign, so he said there was something
17    funny about the stop sign you did. He asked
18    me if I was drinking, and I told him no,
19    because I was working. Back then I was a
20    little bit sick or something, I don't know,
21    so.
22 Q. Did the police officer ask you for your
23    registration?
24 A. Right.

Page 65

1  Q. For your license?
2  A. Right.
3  Q. Then did he go back to the police car?
4  A. Right. He went back to the police car, but
5     he didn't arrest me. He said "This time
6     I'll give you a break, this time, but that
7     letter, I don't know about that letter."
8  Q. Did you ever give him a copy of either of
9     the letters we've been discussing?
10 A. Right. No, I didn't -- well, the only time
11    I gave him a copy and he didn't take it, the
12    only time I gave them a copy was when they
13    came to my house after work.
14 Q. Let's go on. So you were never taken to the
15    police station after this, after this
16    instance where the police officer pulled you
17    over because you didn't stop, right?
18 A. No.
19    MR. KELLY: When was this, do you
20    know? Do you remember?
21    THE WITNESS: That was before 2001,
22    that's all I know. I was going through all
23    this stuff. I can't remember everything.
24 Q. We'll get to what you were going through,

17  (Pages 62 to 65)

Page 66

```
 1    but you what were you going through at the
 2    time?
 3  A. I was working. I was doing food delivery.
 4  Q. Was food delivery the work you were doing or
 5    were you doing other working?
 6  A. No, at that time, I was doing food delivery.
 7  Q. So you were going through that. What else
 8    were you going through?
 9  A. Watch out for the police because of the
10    warrant and explaining to my family. I had
11    to get away from my father's face.
12  Q. So let's talk about another time where you
13    were arrested or taken to the police station
14    or, you know, taken from where you were
15    because of the warrant?
16  A. Uh-huh.
17  Q. Because it sounds like this time we just
18    discussed, the warrant issue didn't come up?
19  A. No, it did came up, but the only thing is
20    that because of that letter, he let me go.
21  Q. So you showed him the letter that time?
22  A. Right. He said that letter -- he said "I
23    could write that letter in my house, but you
24    know what, I'll give you a break this time."
```

Page 68

```
 1    arrest, is that right?
 2  A. Right.
 3  Q. You never sought the treatment of a
 4    psychiatrist or psychologist or social
 5    worker because of this?
 6  A. Right.
 7  Q. You don't have any permanent disabilities,
 8    right?
 9  A. No.
10  Q. You're making a claim for emotional damages,
11    right?
12  A. Yeah, most likely.
13  Q. Tell me how you've been emotionally damaged.
14  A. My family is big and every time we get
15    together and my nephew ask me about the case
16    and then somebody come over and start
17    listening and I wish this person didn't have
18    to know what I'm talking about.
19  Q. Who is your nephew?
20  A. His name is Eduardo, Eduardo Fernandez.
21  Q. Does he live at Geneva Ave. with you?
22  A. No, he lives somewhere in Quincy.
23  Q. Tell me how else you've been emotionally
24    damaged.
```

Page 67

```
 1  Q. So you were let go. So now were there any
 2    other times where you were taken to a police
 3    station or anything like that because of the
 4    warrant?
 5  A. I'm pretty sure, yeah, but I can't remember
 6    everything.
 7  Q. Okay. That's fine. You testified in your
 8    Interrogatories that you were not physically
 9    harmed at all during any of the arrests or
10    confinements, is that correct?
11  A. Well, there's only one time, the one in
12    Downtown Crossing. I was yelling like a dog
13    in front of the people, and there was people
14    yelling "What'd he do? He robbed somebody?"
15    And then the police officer said "Put your
16    hands up." I did not like that he was
17    screaming at me like a dog.
18       MR. KELLY: Do you understand the
19    question?
20       THE WITNESS: Yeah.
21  Q. You weren't physically harmed?
22  A. No, not physically harmed.
23  Q. You also testified that you didn't receive
24    any medical treatment in connection with the
```

Page 69

```
 1  A. Every time I go visit my family, "Hey, how's
 2    that case coming."
 3  Q. So you have to talk to your family about the
 4    case?
 5  A. Yeah.
 6  Q. Are you emotionally damaged in any other
 7    way?
 8  A. I don't think so.
 9  Q. So we were discussing before that you were
10    arrested for operating your car under the
11    influence, is that correct?
12  A. That was only one time.
13  Q. Do you remember when that happened when you
14    were arrested?
15  A. That happened in the year 2000.
16  Q. My records show that it happened in March of
17    1999, does that --
18  A. Maybe it was close to the year or something.
19  Q. What time of day was it when you were
20    arrested?
21  A. It was like about two o'clock, three o'clock
22    in the morning.
23  Q. Do you remember where you were when you were
24    arrested?
```

18 (Pages 66 to 69)

Page 70

1  A.  Right, I was driving through --(inaudible)--
2      because the girl I was giving a ride, she
3      lives in Lowell, so I was giving her a ride
4      to her house.
5  Q.  Who was that girl?
6  A.  That was Jaime Kirby.
7  Q.  So you were driving up to Lowell?
8  A.  Right, but we were following somebody to the
9      highway and we didn't know which way he
10     went, so we were driving around looking for
11     them, and then she -- well, I have to say I
12     did it, because they blame it on me.
13 Q.  So you were driving the car, right?
14 A.  Actually, I wasn't driving the car.  I let
15     her drive the car, but they charge me for
16     it.
17 Q.  When you were pulled over, did the police
18     officer come up to the car?
19 A.  The police officer didn't come until about
20     ten minutes.
21 Q.  So you sat at the side of the road with a
22     police officer behind you for about ten
23     minutes?
24 A.  Well, a bunch of people came out after the

Page 71

1      accident, and I told them to call the
2      police.
3  Q.  Tell me what kind of accident happened.
4  A.  She was driving and hitting about five cars
5      or something.
6  Q.  Did she sideswipe the cars?
7  A.  Yeah, that's what she did.  I told her to
8      stop, let me drive, and she wouldn't stop.
9  Q.  So were you arrested after the accident?
10 A.  Right, the police officer, they came up to
11     me.  He said "You got a warrant, we got to
12     take you," and he said he brought me to
13     Dorchester District Court.
14 Q.  First, he took you to the police station,
15     right?
16 A.  Yeah.
17 Q.  Eventually, you were charged with operating
18     under the influence, correct?
19 A.  Correct.
20 Q.  Had you been drinking?
21 A.  Yeah.
22 Q.  So you went to the police station and did
23     they book you there, did they take your
24     photo?

Page 72

1  A.  They only took my photo.
2  Q.  Did you spend the evening in lock up again?
3  A.  Right.
4  Q.  Did you go to a court after that, the next
5      morning?
6  A.  Right, to that one I went to Dorchester
7      District Court.
8  Q.  You went to the court and you were
9      arraigned, I guess?
10 A.  I went to the court and she looked at the
11     letter, the judge looked at the letter, and
12     she said "Okay, I'll keep a copy of this,"
13     and she was very interested.
14 Q.  Do you remember who the judge is?
15 A.  It was a lady.
16 Q.  What was done about your OUI charge?
17 A.  What does that mean, "OUI".
18 Q.  I'm sorry, Operating Under the Influence.
19 A.  They suspended my license.
20 Q.  Did you have a trial or anything?
21 A.  No.
22 Q.  Did you plead guilty at some point?
23 A.  They gave me a year probation because the
24     other people didn't show up.

Page 73

1  Q.  So -- let's go off the record.
2          (Discussion off the record.)
3  Q.  So at some point you -- were you put on
4      probation?
5  A.  Right.  One year probation.
6  Q.  And your license was suspended?
7  A.  My license was suspended.
8  Q.  How long was it suspended?
9  A.  Ninety days, I think it was.
10 Q.  Did you drive while your license was
11     suspended?
12 A.  No.  That's when I had to go to school.
13 Q.  So did the Court order you to go to some
14     kind of a training program?
15 A.  The one that I just showed you.
16 Q.  So Exhibit No. 4 is a certificate that says
17     that you finished that training or
18     counselling?
19 A.  Correct.
20 Q.  How many hours did you have to spend in this
21     course?
22 A.  It was about like from four to six, or maybe
23     seven.
24 Q.  How many times did you have to go?

Page 74

1  A. I think it was like three days a week,
2     something like that.
3  Q. How many weeks?
4  A. That was about like four months, something
5     like that.
6  Q. So this certificate is in Spanish, right?
7  A. Yeah.
8  Q. Was the course done in Spanish?
9  A. Right.
10 Q. Did you understand everything that was going
11    on?
12 A. Right. You got to make sure you don't go
13    over there with alcohol on you.
14 Q. That makes good sense, right?
15 A. Right.
16 Q. First of all, do you speak fluent Spanish?
17 A. Yes, I do. I speak three languages.
18 Q. What's the third language?
19 A. Cape Verdean.
20 Q. Interesting. How did you learn Cape
21    Verdean?
22 A. Because the neighbors, when I was 11, they
23    talk pretty much in Spanish, so then when I
24    was working at the newspaper, there was

Page 75

1     somebody who spoke Cape Verdean, and so then
2     I learned how to pronounce the way they
3     talk, and then when I was going to school, I
4     was listening to them, so it's been years.
5  Q. Now, other than the arrest in 1999 for
6     operating under the influence, were you
7     arrested at any other time?
8  A. Well, all I remember, I always counted every
9     time I was arrested. It was seven times,
10    but I can't recall every time.
11 Q. Do you remember being arrested in November
12    of 2001?
13 A. Yeah.
14 Q. Why were you arrested in November of 2001?
15 A. Because I was -- the police officer came out
16    of nowhere flying, and he looked at me and
17    said "What are you doing over there," and I
18    was just drinking a soda.
19 Q. I think we discussed that, but I'm talking
20    about an arrest that happened after the
21    warrant was cleared up in court?
22 A. After the warrant was cleared up?
23 Q. Do you remember being arrested for stealing
24    a car?

Page 76

1  A. No, I never stole a car.
2  Q. Well, there is a record of an arrest in
3     November of 2001 for stealing a car and
4     larceny, or stealing some money, between $50
5     and $250. Do you recall any of that?
6  A. No, I never stole any money.
7  Q. Do you remember your employer at the time,
8     Mr. Brown, pressing any charges against you
9     for stealing a car?
10 A. That time, he falsely accused me because he
11    was jealous of his girl -- the guy that was
12    driving the car, he handed me the key,
13    because I was working over there. He hand
14    me the key until he went to China, and then
15    when he went to China, while he was in
16    China, I was taking the car home. He went
17    over there for about a month.
18 Q. Who was it that went to China?
19 A. The name Bobby. One of the guys that work
20    at East Coast Restaurant.
21 Q. Was this Bobby's car?
22 A. This is Bobby's car, right.
23 Q. This is Bobby's car that he owned
24    personally?

Page 77

1  A. He owned personally.
2  Q. Did Bobby give you the keys?
3  A. Right, that was the car I was driving.
4  Q. What's Bobby's last name?
5  A. His last name, I can't recall. All I know
6     is they call him Bobby.
7  Q. So Bobby gave you the keys to his car?
8  A. Right.
9  Q. What kind of car was it?
10 A. The kind of car it was -- it was a strange
11    car, like a racing car or something. So the
12    guy, his name is Dwight Brown, he was
13    working over there and he was giving me a
14    hard time, I didn't like the way he was
15    talking to me, so I told him "Listen, I
16    don't like the way you're talking to me. If
17    you keep talking to me like that in front of
18    the customers, I'm going to leave," so
19    that's exactly what I did, I left, and I
20    called the owner and I told him "Listen,
21    send somebody else to work for me," so I
22    left, and then the next day I returned the
23    car safely. I left it at the parking lot of
24    the Grover Cleveland, because other time, I

20 (Pages 74 to 77)

G&M Court Reporters, Ltd.
617-338-0030

Page 78

1  worked for them for years, sometimes it's so
2  late that you have to go home with the money
3  and come back and pay, you know what I'm
4  saying, so that was -- he wanted to screw me
5  up, because he was jealous of his girlfriend
6  and me, because his girlfriend and me
7  were -- we were friends.
8  Q. What was his girlfriend's name?
9  A. Suzanne Ruggiero.
10 Q. So Suzanne Ruggiero is Dwight Brown's
11    girlfriend?
12 A. Right.
13 Q. Eventually, in connection with taking the
14    car that time you were arrested, right?
15 A. They came to my house the next day.
16 Q. Right.
17 A. And they --
18 Q. Was Suzanne Ruggiero there with you?
19 A. Right, she was at my house.
20 Q. You were arrested then, right?
21 A. In my house, yeah.
22 Q. Then were you taken down to the police
23    station?
24 A. Yeah.

Page 79

1  Q. What happened to you at the police station?
2  A. Just spend the night in jail.
3  Q. Did you have to go to court after that?
4  A. Right.
5  Q. Which court did you go to?
6  A. Went to Dorchester.
7  Q. What happened at court?
8  A. What happened in the court?
9  Q. Yes.
10 A. The judge asked the police officer if the
11    car was properly safe, where did he find it,
12    and he found it where I left it, I parked it
13    at the parking lot of the Grover Cleveland.
14 Q. Okay.
15 A. So then the police officer told the judge
16    that he went to my house and the judge asked
17    him, "Can you see the parking lot from his
18    house," and the police officer said "No," so
19    the judge looked at the police officer and
20    said "I don't want to hear no more from this
21    police officer," and then Dwight was
22    talking, and there was no need for him, you
23    know, what I'm saying, they asked him if he
24    owns the car, if he owns the car, what gives

Page 80

1  him the right to accuse me of stealing his
2  car when it's not his car.
3  Q. But you say you had permission from Bobby to
4    use the car?
5  A. Exactly.
6  Q. So what happened at the end of the day in
7    court?
8  A. At the end of the day, they let us go.
9  Q. So you didn't have to plead guilty or admit
10    anything?
11 A. Right. No.
12 Q. So basically you were just totally let go?
13 A. Right.
14 Q. Were you ever sentenced at all?
15 A. No.
16 Q. You were never given any probation or a fine
17    of any kind?
18 A. No.
19    MR. KELLY: Off the record.
20    (Discussion off the record.)
21 A. They gave us $100 each to pay and then when
22    I went to pay it, they said "No, you don't
23    have to pay it."
24 Q. Where did you try to pay that?

Page 81

1  A. At the Dorchester -- where you go pay in
2    Dorchester.
3  Q. Okay.
4    MR. KELLY: Off the record.
5    (Discussion off the record.)
6  Q. So other than the arrest for stealing a car,
7    even though I understand that you know you
8    say you didn't steal the car, and the arrest
9    for the operating under the influence that
10    we talked about, and the other arrests that
11    have to do with the warrant issue, are there
12    any other times that you've been arrested?
13 A. No.
14 Q. Have you ever been the subject of a
15    restraining order?
16 A. That's one time I took Dwight Brown to
17    court. I took Dwight Brown to court one
18    time because he sneaked -- his girlfriend
19    was in my house, and he was looking for
20    Suzanne Ruggiero, and he sneaked in my
21    house.
22 Q. Dwight Brown sneaked into your house?
23 A. Right.
24 Q. Okay.

21 (Pages 78 to 81)

Page 90

1    remember his phone number, (857) 389-0228.
2  Q.  You seem to have a good memory for these
3    numbers?
4  A.  Yeah, pretty much.
5  Q.  When you said you were painting on the side,
6    does that mean you also had another job?
7  A.  Right, the guy, he got too old, so then I
8    was working for this guy James Hiemey --
9    James Hernandez.
10  Q.  Did you have any other jobs while you were
11    painting?
12  A.  Yeah, sometime working for East Coast,
13    because I was working for East Coast steady.
14  Q.  When did you work for East Coast?
15  A.  Between 2000 it was off and on. Sometimes
16    it was off and on.
17  Q.  So you worked for East Coast from when to
18    when?
19  A.  From, I think, maybe '99 or '98 or 2000.
20    '99 to 2003, something like that.
21  Q.  Why did you stop working at East Coast?
22  A.  Because she wasn't paying too good, so I
23    found a better job. I found a better job
24    working for Peter in 2002.

Page 91

1  Q.  That's Peter Trinh, right?
2  A.  Right.
3  Q.  But he wasn't paying very well, either?
4  A.  Yeah, pretty much he wasn't paying pretty
5    well, and I didn't like it because sometimes
6    we had to go far away, go to Philadelphia,
7    and $50 for one day, but anyway, the last
8    job I got now is Maidu, something like that,
9    it's in Boston, 645 Summer Street in South
10    Boston, and then the office.
11        MR. KELLY: We got it.
12  Q.  Okay. So when were you working for the
13    Somerset Club?
14  A.  The Somerset Club.
15  Q.  Yeah, what years?
16  A.  I think 1988 to, I think, 2007 -- 2097.
17  Q.  1997?
18  A.  1997, yeah, or 1996, 1997. They knew about
19    me being --
20        MR. KELLY: Focus on the question.
21    There isn't one before you right now.
22    Right? Let's get this over while we're all
23    still relatively young.
24  Q.  So you were washing dishes at the Somerset

Page 92

1    Club?
2  A.  Yeah. Because the thing is --
3  Q.  Hold on. I really counsel you, don't say
4    anything when I'm not asking you a question.
5  A.  All right.
6  Q.  As a result of being arrested because of the
7    warrants, you mentioned possibly missing
8    some days of work?
9        (Witness nods.)
10  Q.  When was that?
11  A.  I'm sorry, can you repeat that again?
12  Q.  I'm sorry. How many days of work did you
13    miss because you were arrested in connection
14    with the warrants?
15  A.  I'd say like 14.
16  Q.  You think about 14 days?
17  A.  Yeah.
18  Q.  Do you know when those days were?
19  A.  That was when they arrest me, they would
20    keep me in jail until --
21  Q.  But do you know the dates that that
22    happened?
23  A.  In March 10, 97, because I was working at
24    the Mass. College of Arts, and that one, let

Page 93

1    me see, I don't recall if I went in the next
2    day, but I think I didn't go to work.
3  Q.  Okay. Do you remember any of the other
4    dates that you missed because of the
5    arrests?
6  A.  Sometime while I was working, while I was
7    working and when I was going to work.
8  Q.  Okay. You mentioned before that your car
9    was towed once when you were arrested
10    because a woman you were with just went home
11    and you were taken to the station, so they
12    had to get your car off the road, right?
13  A.  Right.
14  Q.  That happened once, did it ever happen
15    again?
16  A.  Yeah, it happened.
17  Q.  When did it happen the second time?
18  A.  I can't remember the year, but that happened
19    on Alston Street. They didn't tow my car
20    every time that they arrested me.
21  Q.  I understand that. So when you were on
22    Alston Street, when was that?
23  A.  The year? I don't remember the year. It
24    wasn't the Oldsmobile car that I had.

24  (Pages 90 to 93)

Page 94

1   Q. It was the Oldsmobile?
2   A. No, it wasn't.
3   Q. What car was it?
4   A. It was a weird name. Mercury, something
5      like that. I can't recall the name of the
6      car.
7   Q. Do you remember the year of the car at all
8      or the license plate or anything?
9   A. No.
10  Q. Do you have any receipt of, you know,
11     picking up the car?
12  A. No.
13  Q. Was the car, did you ever have a car
14     impounded or taken to the lot any other
15     time, other than those two times?
16  A. No. They towed my car about two or three
17     times, that's all.
18  Q. Do you remember the third time then?
19  A. I don't recall the third time.
20         MR. FORTON: Let me just take a
21     minute.
22         (Recess.)
23  Q. At some point in connection with these
24     arrests, were you interviewed by someone

Page 95

1      from Channel 7?
2   A. Yes.
3   Q. Do you remember who that was?
4   A. I remember her first name Christy something.
5      Christine.
6   Q. Do you remember where you were interviewed?
7   A. I was in my lawyer's office.
8   Q. How did you come to be interviewed, how did
9      they choose you?
10  A. They chose me because my lawyer spoke to
11     them the first time that I saw him at the
12     Superior Court, and that's how.
13         MR. FORTON: I don't think I have
14     any other questions right now.
15         MR. KELLY: Off the record for a
16     second.
17         (Discussion off the record.)
18         MR. KELLY: A couple quick
19     questions.
20         CROSS-EXAMINATION
21     (By Mr. Kelly)
22  Q. Manuel, you recall Mr. Forton asking you
23     whether or not you were physically or
24     emotionally harmed from these arrests that

Page 96

1      were made on these warrants, correct?
2         (Witness nods.)
3   Q. I didn't hear you say anything.
4   A. Yes. Correct.
5   Q. With regard to physical harm, you indicated
6      in your Interrogatories and you indicated
7      here today that you were not physically
8      harmed by the police officers during these
9      arrests, correct?
10  A. Correct.
11  Q. But with regard to emotional harm which he
12     asked you, you began to talk about that
13     you're uncomfortable when the matter is
14     brought up around family members, correct?
15  A. Correct.
16  Q. Family members or friends were present on
17     one or more of these occasions when you were
18     arrested on this warrant, correct?
19  A. Correct.
20  Q. You were embarrassed at that time?
21  A. Correct.
22  Q. You suffered emotionally from that?
23  A. Yes, that's fair to say.
24  Q. At one point you affirmed in your

Page 97

1      Interrogatories that you were afraid of
2      police when you saw a police car, is that
3      correct?
4   A. That's correct.
5   Q. Do you still have some of those feelings
6      today about nervousness over seeing a police
7      car or policeman in your area or vicinity?
8   A. Pretty much.
9   Q. With regard to any embarrassment you may
10     have suffered with coworkers during this
11     time. Did some of the people that you
12     worked with or employed you, were they aware
13     of these arrests?
14  A. Yes, they were.
15  Q. You suffered some embarrassment and some
16     emotional trauma from that, is that fair to
17     say?
18  A. That's fair to say.
19         MR. KELLY: Thank you.
20         MR. FORTON: I don't have any other
21     questions. Thank you. Just on the record,
22     are there any other documents that you're
23     going to be giving me that respond to the
24     document request?

25 (Pages 94 to 97)

Page 98

```
 1        MR. KELLY:  Yes and no.  Yes, if I
 2  can get them through you or if I have a
 3  subpoena issued to the keeper of records
 4  with the Boston Police with regard to the
 5  initial arrest, as we know his name to be,
 6  Louis Santiago, and things along those
 7  lines, so anything that I have apart from
 8  what I think we're going to exchange, I'll
 9  obviously give you, but I have nothing more
10  than what you have right now.
11        MR. FORTON:  All right.  Thank you.
12        (Whereupon the Deposition was
13  concluded at 3:05 p.m.)
14
15
16
17
18
19
20
21
22
23
24
```

Page 99

```
 1  COMMONWEALTH OF MASSACHUSETTS
 2  MIDDLESEX, ss.
 3
 4   I, Kelly G. Patterson, a Notary Public duly
 5  commissioned and qualified within and for
 6  the Commonwealth of Massachusetts, do hereby
 7  certify:
 8   That MANUEL ROSA, the witness whose
 9  deposition is hereinbefore set forth, was
10  duly sworn by me, and that such deposition
11  is a true record of the testimony given by
12  the witness to the best of my skill,
13  knowledge, and ability.
14   IN WITNESS WHEREOF, I have hereunto set my
15  hand and my affixed notarial seal this 29th
16  day of September, 2005.
17
18
19        Kelly G. Patterson
20        Notary Public
21
22
23  My Commission expires:
24  September 20, 2007
```

6  (Pages 98 to 99)

G&M Court Reporters, Ltd.
617-338-0030